1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,

6          Plaintiff,

7     v.                              CASE NO:  1:17-MJ-48

8    WILLIAM HUGH WILSON,

9          Defendant.

10    _____/

11                 * * * *

12          PRELIMINARY and DETENTION HEARING

13                 * * * *

14

15     BEFORE:   THE HONORABLE RAY S. KENT
                  United States Magistrate Judge
16                 Grand Rapids, Michigan
                  February 21, 2017
17
     APPEARANCES:
18
     APPEARING ON BEHALF OF THE PLAINTIFF:
19
         ALEXIS M. SANFORD
20        Assistant United States Attorney
         P.O. Box 208
21        Grand Rapids, Michigan  49501-0208

22    APPEARING ON BEHALF OF THE DEFENDANT:

23        GEOFFREY UPSHAW
         Law Office of Geoffrey Upshaw
24        429 Turner Avenue, N.W.
         Grand Rapids, Michigan  49504

25

1          I N D E X

2

3    WITNESS:                                                Page

4

5       Direct Examination by Ms. Sanford              4

6       Cross Examination by Mr. Upshaw               13

7       Redirect Examination by Ms. Sanford          30

8

9

10

11                          * * * *

12

13                   Grand Rapids, Michigan

14                   February 21, 2017

15                   at approximately 2:31 p.m.

16                      PROCEEDINGS

17        THE COURT:  This is 17-MJ-48; United States vs.

18   William Wilson.   Ms. Sanford appears on behalf of the United

19   States.  Mr. Upshaw on behalf of Mr. Wilson.

20        Mr. Wilson, we have two matters scheduled here this

21   afternoon.  The first is a preliminary hearing.  If we hold

22   that hearing, the government would have to establish probable

23   cause to believe that you violated federal criminal law in one

24   or more of the ways set forth in the criminal complaint.

25        The second matter up is a bond hearing, at which the

1 government will have to prove by a preponderance of the

2 evidence that you are a risk of nonappearance at future

3 proceedings in this case or by clear and convincing evidence

4 that you are a danger to the community, or I will release you

5 on bond.

6       Couple things you should know about both these

7 hearings; the Rules of Evidence that apply at a trial do not

8 apply at these two proceedings.  So things like hearsay

9 evidence are admissible.  Even evidence that may have been

10 collected against you unlawfully.  And I have no reason to

11 believe there is such evidence, but even if there was, that

12 evidence would also likely be admissible against you.

13       Further, the parties need not present evidence in the

14 form of testimony by a witness.  The parties can present,

15 meaning the government and you through Mr. Upshaw, can present

16 evidence in a form we call a proffer.  What that means is the

17 lawyer can simply go to the podium and tell me facts, which I

18 will then consider as if they had come from the mouth of a

19 witness on the witness stand.

20       So with that introduction and explanation,

21 Mr. Upshaw, how are we going to proceed on these matters?

22       MR. UPSHAW:  We contest probable cause and detention.

23       THE COURT:  All right.  Miss Sanford.

24       MS. SANFORD:  Thank you, your Honor.

25       THE COURT:  The floor is yours.

1    MS. SANFORD:  At this time, I will call Special Agent

2 David Balkema to the stand.

3        DAVID BALKEMA - GOVERNMENT WITNESS - SWORN

4            DIRECT EXAMINATION

5 BY MS. SANFORD:

6 Q.   Can you state and spell your name for the record, please.

7 A.   My name is David J. Balkema.  The last name is

8 B-a-l-k-e-m-a.

9 Q.   Thank you.

10       Where are you employed?

11 A.   I'm a special agent with the Bureau of Alcohol, Tobacco,

12 Firearms and Explosives.

13 Q.   How long have you been an ATF agent?

14 A.   A little over 26 and a half years.

15 Q.   You are the case agent on this particular matter involving

16 William Wilson and Mr. Stevens?

17 A.   Yes, that is correct.

18 Q.   This case came about because a search warrant was executed

19 at a residence in Kalamazoo, Michigan?

20 A.   Yes.

21 Q.   Do you recall the address of that residence?

22 A.   I believe it was 732 Hawley Street, in Kalamazoo.

23 Q.   H-a-w-l-e-y?

24 A.   Yes.

25 Q.   You were not present for the execution of that search

1  warrant?

2  A.  I was not.

3  Q.  You've had an opportunity to review the warrant?

4  A.  Yes.

5  Q.  What was the basis for the search warrant?

6  A.  There were two, what would be described as controlled

7  purchases of crack cocaine from that residence; one on December

8  22nd, I believe, and then one on or about January 4th.

9  Q.  The purchases of controlled substances from that residence

10  were done by an informant?

11  A.  Yes.

12  Q.  This was somebody that was known to KVET officers?

13  A.  Yes.  The Kalamazoo Valley Enforcement Team, that's my

14  understanding, yes.

15  Q.  All right.  The Kalamazoo Valley Enforcement Team are the

16  officers who obtained the warrant and executed it?

17  A.  Yes.

18  Q.  And the informant who did the purchases for them was

19  someone that they had worked with in the past?

20  A.  I don't know that for sure.

21  Q.  All right.  The informant, what did the informant tell the

22  KVET officers before the controlled buys were attempted?

23  A.  The informant was aware of two subjects that they knew as

24  Ace and Big Baby that were selling cocaine out of-- crack

25  cocaine out of 732 Hawley Street.

1  Q.  All right.  And Ace and Big Baby would be what we might

2  refer to as street names?

3  A.  Yes, nicknames.

4  Q.  Okay.  You talked about a controlled buy that occurred on

5  December 22nd of 2016?

6  A.  Yes.

7  Q.  That was from the 732 Hawley address?

8  A.  That is correct.

9  Q.  And the informant then turned over what they had purchased

10  to officers?

11  A.  Yes.

12  Q.  And was that field tested?

13  A.  Yes.

14  Q.  And did it test positive for cocaine?

15  A.  Yes.

16  Q.  And who did the informant say they had purchased the

17  cocaine from on December 22nd?

18  A.  The person that the informant knew as Ace.

19  Q.  What did officers do to try and ascertain who Ace was?

20  A.  They showed the informant what is referred to as a

21  six-pack, six photograph line-up, and the informant identified

22  Ace as William Wilson.

23  Q.  Okay.  The second controlled buy that was done out of that

24  home on January 4th of this year, was not from Ace; is that

25  correct?

1  A.  That is correct.

2  Q.  That was from the other person who the informant knew as

3  Big Baby?

4  A.  Yes.

5  Q.  All right.  Based on these controlled purchases, KVET

6  obtained a warrant.  When was the warrant executed?

7  A.  On January 5th of 2017.

8  Q.  And what did KVET officers observe when they executed the

9  warrant?

10  A.  Upon entering, they observed two shotguns and a revolver

11  in the dining room area, also narcotics packaging, marketing

12  paraphernalia.

13      All right.  The two shotguns, they were both

14  Mossbergs?

15  A.  Yes, Mossbergs.

16  Q.  All right.  One of them was loaded?

17  A.  Yes, the twenty gauge, I believe was loaded.  There was a

18  12 gauge and a twenty gauge.

19  Q.  All right.  And then there was a revolver, do you recall

20  whether that was loaded?

21  A.  It had two rounds, if I remember correctly.

22  Q.  All right.  And then you said narcotics paraphernalia.

23  A.  Sandwich bags, lottery tickets, digital scales, things

24  that are used for the packaging of narcotics, and obviously the

25  weighing, measuring of it as well.

1  Q.  All right.  Those items, the plastic bags, the scales were

2  on the dining room table?

3  A.  At least in part, yes.

4  Q.  All right.  The lottery tickets, where were those located,

5  if you recall?

6  A.  I don't without referring to the report.  I believe there

7  was some in an end table and some in a tote.

8  Q.  And what is the significance of lottery tickets to

9  narcotics cases?

10  A.  Those are used to bindle up narcotics to sell.

11  Q.  So small amounts of cocaine or other substances are placed

12  in them and then they are folded up?

13  A.  Yes.

14  Q.  There was a fourth firearm recovered?

15  A.  Yes.  In what is described as the recliner portion of a

16  couch.  A KVET officer activated the recliner, and a nine

17  millimeter pistol dropped out of it.

18  Q.  That was a Smith and Wesson?

19  A.  Yes.  Bearing an obliterated--

20  Q.  That was a Smith and Wesson pistol?

21  A.  Yes, bearing an obliterated serial number.

22  Q.  The serial number was obliterated when the officers found

23  the weapon?

24  A.  Yes.

25  Q.  It has since been restored?

1 A. Yes.

2 Q. And what was the status of that gun?

3 A. It had been previously reported stolen.

4 Q. Was that the only gun in the home that had been reported

5 stolen?

6 A. No, one of the Mossbergs also had been reported stolen

7 previously.

8 Q. All right. There was ammunition found in the home?

9 A. Yes. There was a variety of ammunition found.

10 Q. Various calibers?

11 A. I believe 40 caliber, nine millimeter, shotgun slugs, the

12 .32 caliber.

13 Q. Okay. And those were found throughout the home?

14 A. That's my understanding, yes.

15 Q. There was also money found in the home?

16 A. Yes. There was, I believe, $800 or close to that on the

17 dining room table, and then Rodney Martin had $900-some on his

18 person.

19 Q. All right. Was any-- We've talked about narcotics

20 paraphernalia. Were narcotics recovered?

21 A. Yes, five grams of cocaine.

22 Q. Where was that located?

23 A. In a-- basically stashed in a Pringles can with a false

24 bottom.

25 Q. A way to try to hide something from being--

1 A. Yes.

2 Q. --easily found or obtained?

3 A. Yes.

4 Q. And that Pringles stash can was located on the dining room

5 table as well?

6 A. I believe so.

7 Q. Were Mr. Wilson and Mr. Martin, Ace and Big Baby, present

8 when the warrant was executed?

9 A. Yes.

10 Q. Were they the only ones present?

11 A. No, there was one other individual named James Hundley.

12 Q. H-u-n-d, as in David, l-e-y?

13 A. I believe so, yes.

14 Q. And what was Mr. Hundley's relationship to the residence?

15 A. He was a roommate. He stayed there. He had also stated

16 that he had purchased crack cocaine from them on other

17 occasions.

18 Q. Did Mr. Martin or Mr. Wilson give statements to officers?

19 A. They did not.

20 Q. All right. So Mr. Hundley was the only one who agreed to

21 speak to the officers?

22 A. Yes.

23 Q. He indicated that he stayed there and that he had

24 purchased cocaine from Mr. Wilson and Mr. Martin?

25 A. I believe so, yes.

1 Q. And did he know where they kept the cocaine?

2 A. No. He told officers that it was his belief that they

3 wouldn't tell him where they kept their cocaine, because they

4 would be concerned that he would steal it.

5 Q. Where did Mr. Hundley say he lived in the house?

6 A. I believe he stated he had stayed in the basement and had

7 just recently been allowed to live in a bedroom or had moved up

8 into a bedroom.

9 Q. Where did he say that Mr. Wilson lived in the home?

10 A. He had a bedroom.

11 Q. And what about Mr. Martin?

12 A. I believe he said Mr. Martin stayed on a couch in the

13 livingroom area.

14 Q. The four weapons that we discussed earlier; two shotguns,

15 a Smith and Wesson pistol, and then there was a fourth handgun;

16 is that correct?

17 A. Yes, Iver Johnson revolver, a .32 caliber revolver.

18 Q. Were any of those weapons manufactured in State of

19 Michigan?

20 A. No, they were not.

21 Q. All of them would have had to travel in interstate

22 commerce?

23 A. That is correct.

24 Q. All right. Based on your training and experience, the

25 amount of cocaine that was recovered along with the other items

1  we talked about, scales, plastic baggies, etcetera, is that

2  consistent with possession with intent to distribute a

3  controlled substance?

4  A.  Yes, it is.

5  Q.  Then finally, you had an opportunity to look into

6  Mr. Wilson's criminal history?

7  A.  I did.

8  Q.  Has he been convicted of a felony in the State of

9  Michigan?

10  A.  He has, yes.

11  Q.  Has he had his right to possess firearms restored?

12  A.  No, he has not.

13  Q.  What felonies has he been convicted of?

14  A.  All of his felony convictions are for delivery of a

15  controlled substance.

16  Q.  And that--  And there are four of those; is that correct?

17  A.  I believe so, yes.

18  Q.  Would a conviction in 2004 in Kalamazoo County sound

19  right?

20  A.  Yes.

21  Q.  In 2006 in Kalamazoo County?

22  A.  Sure, yes.

23  Q.  Then two of them in 2007 in St. Clair County?

24  A.  Yes.  Actually I believe one of those was in Detroit.

25  Q.  Okay.  I apologize.

1          MS. SANFORD:  I have no further questions.

2          THE COURT:  Mr. Upshaw, cross examination.

3          MR. UPSHAW:  Thank you.

4                    CROSS EXAMINATION

5    BY MR. UPSHAW:

6    Q.  Mr. Balkema, the alleged controlled buy was on December

7    22nd, correct?

8          THE COURT:  Mr. Upshaw, I'm going to embarrass you

9    now, and I'm sorry about that.  You're just the latest in a

10   long series of lawyers from the both sides of the aisle that

11   I've embarrassed.

12            When we have witnesses on the witness stand, would

13   you please refer to the agent by his title rather than Mr.,

14   because he earned his title just like you and I did.

15          MR. UPSHAW:  Sure, if I can.

16   BY MR. UPSHAW:

17   Q.  Is it agent or something else?

18   A.  Special agent or agent is perfectly acceptable to me.

19   Thank you.

20          THE COURT:  Thank you.

21          MR. UPSHAW:  Thank you, your Honor.

22   BY MR. UPSHAW:

23   Q.  Special Agent Balkema, and us attorneys, we usually say

24   the last names when we don't really know what the appropriate

25   title is.

1          THE COURT:  Very true.

2     BY MR. UPSHAW:

3     Q.   Special Agent Balkema, the alleged sale was on December

4     22nd, correct?

5     A.   That's my understanding, yes, sir.

6     Q.   And the search warrant was, fair to say, around two weeks

7     or 14 days later?

8     A.   Yes.

9     Q.   And the alleged sale dealt with crack cocaine, correct?

10    A.   Yes.

11    Q.   And you mentioned a Mr. Hundley in the house, and

12    Mr. Hundley related my client to crack cocaine, correct?

13    A.   I believe so, yes.

14    Q.   And the search of the house on January 5th, was there

15    crack cocaine located?

16    A.   Not to my knowledge.

17    Q.   Okay.  What was found as far as narcotics in the home?

18    A.   Powder cocaine and cocaine residue.

19    Q.   Powder cocaine and cocaine residue?

20    A.   Yes.

21    Q.   And that was found in the livingroom/dining room area,

22    right?

23    A.   I believe so, yes.

24    Q.   Could you tell us the layout of the livingroom/dining room

25    area?

1   A.   I can't.  I wasn't there.

2   Q.   Have you seen pictures of the livingroom/dining room area?

3   A.   I have.

4   Q.   Okay.  Now, let me ask this:  When the entry team came

5   into the home, was there any occupant of the home in the

6   livingroom/dining room area?

7   A.   If memory serves, there was a person that was close to the

8   door who had been proned out, or was laying on the ground

9   rather.  It was near the entrance.  I don't know if that was

10   the living or dining room area.

11   Q.   You said if memory serves, would referring to the police

12   report refresh your memory?

13   A.   Yes, sure.  I have a copy, too, up here.

14   Q.   Okay.

15        THE COURT:  Mr. Upshaw, are you going to refer to the

16   report?

17        MR. UPSHAW:  Yes, I am.

18        THE COURT:  I actually don't have a copy.  Does

19   anybody have a spare that I can follow along?

20        MS. SANFORD:  I have one, your Honor.

21        THE COURT:  Thank you, Miss Sanford.

22        MS. SANFORD:  May I approach?

23        THE COURT:  You may.

24   BY MR. UPSHAW:

25   Q.   Special Agent Balkema, do you have a copy of the report in

1  front of you?

2  A.  Yes, sir.

3  Q.  Okay.  And if you just for the sake of expediency, if you

4  look at Page 17, does that talk about the entry team when they

5  came into the home?

6  A.  Yes.

7  Q.  Okay.  And looking at Page 17, is your memory refreshed

8  about the entry team as they came into the home?

9  A.  Yes.

10  Q.  Okay.  Tell us when the entry team came into the home, was

11  there anyone in view of the entry team?

12  A.  They encountered a dog, and then they enter the front

13  entrance way, the livingroom and encounter a larger male who

14  was already on the ground.

15  Q.  And I would ask you not to read, if you don't mind.

16  A.  I'm sorry.

17  Q.  Sir?

18  A.  Yes.

19  Q.  So that individual was Rodney Martin, correct?

20  A.  I believe so.

21  Q.  Okay.  And tell the Court, tell us where Rodney Martin was

22  standing, if you remember, by the report, from memory, or

23  anything else, where was he standing?

24  A.  In looking at the report, he was actually laying down in

25  the front entrance way, livingroom area.

1  Q.  In livingroom area, right?

2  A.  In the front entrance way, yes.

3  Q.  Okay.  And is the livingroom closed off from the dining

4  room, is there a sliding door or is it just an open area?

5  A.  That's not something I can tell from the pictures,

6  counselor.  I've never been there.

7  Q.  You saw the photos, correct?

8  A.  I did.

9  Q.  And doesn't the photos depict that the livingroom and

10  dining room are just one big open area?

11  A.  There is a livingroom area and then there is what I would

12  describe as a dining room table.

13  Q.  Sure.

14  A.  I guess in that livingroom area.

15  Q.  Is there a barrier between the livingroom and the dining

16  room?

17  A.  Not that I can see in the picture.  I don't know though.

18  Q.  Okay.  And the powder cocaine was found in the dining

19  room, correct?

20  A.  I believe so.

21  Q.  And I want you to be specific.  This is important.

22      Do you know where the powder cocaine was found?

23  A.  I would have to refer to the report.

24  Q.  Yes, sir.  Take your time, sir.

25  A.  Yes, if there was a copy of the search warrant with the

1  return that might--

2  Q.  Oh--

3  A.  I might have a copy of that if--

4  Q.  There is a tabulation, the police report you have Page 9

5  shows a tabulation, if you can look at that.

6        THE COURT:  Mr. Upshaw, I was reading.  I'm sorry,

7  what page are we going to?

8        MR. UPSHAW:  Page 9.  I was trying to help the

9  Special Agent.

10       THE WITNESS:  On the report, counselor, the police

11  report?

12  BY MR. UPSHAW:

13  Q.  Yes, sir.

14  A.  My Page 9 is a lab report.  Nine of 39.

15  Q.  Okay.  Well--

16       MS. SANFORD:  The judge has my copy.

17       THE COURT:  Here, take it.  No, you need it more than

18  I do.  You should have it.  I thought you had an extra copy,

19  which is why I said extra copy, but.

20       MS. SANFORD:  You're looking for the tabulation?

21       THE COURT:  No, no, you keep it.  That's fine.

22       MS. SANFORD:  Twelve of 39?

23       THE WITNESS:  Yes, the cocaine was located on the

24  dining room table in the Pringles can.

25  BY MR. UPSHAW:

1 Q. And the Pringles can was on the dining room table where

2 the cocaine was, correct?

3 A. Yes.

4 Q. And could you tell the Judge how close in proximity that

5 was to where Rodney Martin was prone at?

6 A. Again, I wasn't there, but I would say from the pictures,

7 it was relatively close.

8 Q. Relatively close. Within five feet, right?

9 A. I wouldn't want to say a distance, but I would like to

10 leave it as relatively close.

11 Q. Okay. And when the entry team came into the home, do you

12 know where Mr. Wilson was?

13 A. I think he was upstairs and came downstairs.

14 Q. Okay. He was upstairs in the bedroom when they came in

15 the house, correct?

16 A. Yes.

17 Q. And he was ordered downstairs and came downstairs, right?

18 A. Yes.

19 Q. Okay. Tell us how many bedrooms-- and this is not a

20 quiz-- I want move on. How many bedrooms are in the home?

21 A. I don't know. I think there were two identified in the

22 report.

23 Q. Okay. Let's talk about one bedroom. Was one bedroom

24 identified as the bedroom of James Hundley?

25 A. Yes.

1 Q.  All right.  And do you remember the items that were

2 located in that bedroom?

3 A.  I do not.

4 Q.  Okay.  If looking at Page 12-- I'm sorry.  My pages are

5 different.

6        Well, let me see.  A search of a bedroom upstairs,

7 you're aware of the police reports because you've read them,

8 right?

9 A.  Yes.

10 Q.  And there was one bedroom upstairs where the police found

11 a crack pipe, right?

12 A.  Correct.

13 Q.  And they found a crack pipe that was hidden inside of a

14 brown shoe, right?

15 A.  That sounds correct, yes.

16 Q.  Was that bedroom identified to be Mr. Wilson's bedroom?

17 A.  I don't believe so, no.

18 Q.  Was there also a gun holster found in that bedroom?

19 A.  No.  There was a gun holster found in a bedroom upstairs.

20 I'm not a hundred percent if it was in the same room as the

21 crack pipe.

22 Q.  So I'll have to ask you to look at the report again.

23 A.  Page 12 again.

24 Q.  No, my pages are different than yours.

25        THE COURT:  Mr. Upshaw, the copy I had the pages were

1  little tiny numbers at the lower right-hand corner.

2       MR. UPSHAW:  My report is just 19 pages and their

3  report is 39 pages.

4       MS. SANFORD:  What page are you trying to get him

5  to?  I'm sorry.

6       Page 19 of 39.

7       THE COURT:  Ms. Sanford, was the entire report made

8  available to Mr. Upshaw?

9       MS. SANFORD:  I didn't realize he didn't have the

10  entire report.  I knew that he represented Mr. Wilson in state

11  court, and I thought that the state prosecutor had provided him

12  with all of the discovery already.  I didn't realize that he

13  didn't have all of the pages.

14       THE COURT:  All right.

15       MS. SANFORD:  I would be more than willing, if we

16  wanted to take a brief recess, to make him a copy.

17       THE COURT:  Can you--  Well, I'm going to let him

18  speak to that.  He looks like he is going to say no, but Miss

19  Sanford, would you please provide Mr. Upshaw with all of the

20  discovery.

21       MS. SANFORD:  Absolutely, your Honor.  I apologize,

22  because I thought that he had everything already or I would

23  have done that.

24       THE COURT:  Mr. Upshaw, before you say no, I want to

25  invite you, and tell you, I would grant a request for a

1 continuance to give you an opportunity to review the complete

2 report or anything else that may be contained in the discovery.

3    MR. UPSHAW:  Thank you.  I would not like a

4 continuance.  If the agent--

5    THE WITNESS:  If I can, the holster and the crack

6 were in the same bedroom.

7    MR. UPSHAW:  Okay.  I just want--  If he is familiar

8 with the report, doesn't matter what the numbers are, your

9 Honor.

10 BY MR. UPSHAW:

11 Q.  All right.  So the crack pipe and the gun holster were

12 present in a bedroom, right?

13 A.  Yes.

14 Q.  All right.  And was that bedroom identified to be

15 Mr. Wilson's bedroom?

16 A.  I don't believe so, no.

17 Q.  All right.  And there was another bedroom upstairs, right?

18 A.  Yes.

19 Q.  And was the other bedroom identified to be Mr. Wilson's

20 bedroom?

21 A.  I believe this was an identification card that was located

22 with his name and picture on it.

23 Q.  Mr. Wilson's I.D. was inside the other bedroom, correct,

24 and in that bedroom was there any ammunition?

25 A.  Not that I recall.

1 Q. Gun holster?

2 A. No.

3 Q. Spent shell casings?

4 A. Not that I recall.

5 Q. Crack cocaine?

6 A. No crack cocaine was located.

7 Q. Powder cocaine?

8 A. No.

9 Q. Okay. And the residue from cocaine, was that residue from

10 the crack pipe that was in the other bedroom or Mr. Hundley's

11 bedroom?

12 A. I believe there was a plate with a couple razor blades

13 where the residue was recovered.

14 Q. From the bedroom that we-- the other bedroom,

15 Mr. Hundley's bedroom, there was residue in that bedroom,

16 correct?

17 A. That I don't know. It wasn't from Mr. Wilson's room

18 though.

19 Q. There was a plate up there with residue on it?

20 A. Okay.

21 Q. If you remember?

22    THE COURT: He just said there was no residue in your

23 client's room. I think that is the billing point, right, and I

24 don't mean to suggest where you are going, but.

25 BY MR. UPSHAW:

1 Q. Well, Mr. Hundley said that my client was selling crack,

2 right?

3 A. He said, yes.

4 Q. And Mr. Hundley I'm getting to that he had residue and a

5 crack pipe in his room, right?

6 A. Yes.

7 Q. And Mr. Hundley on the date of the search, January 5th,

8 are you aware there was an active warrant for Mr. Hundley's

9 arrest? Were you aware of that?

10 A. I am not aware of that.

11 Q. Sworn out by KDPS Officer Bruce, misdemeanor case in 8th

12 District Court, you're not aware of that?

13 A. No, I'm not.

14 Q. Were you aware that in 1991 Mr. Hundley was in prison for

15 two years for a weapons charge in the MDOC, are you aware of

16 that?

17 A. No.

18 Q. Were you aware that Mr. Hundley was arrested for

19 possession of crack cocaine in July, 2006, in Kalamazoo County,

20 and was--

21 A. Doesn't surprise me. He has been described to me as a

22 crack head.

23 Q. So you are aware that Mr. Hundley is a crack head?

24 A. Yes.

25 Q. All right. You are aware that he is a crack head and he

1 panhandles for crack on Hawley Street in front of this

2 convenience store Deja's in Kalamazoo, right?

3 A. I'm not aware of that.

4 Q. But you do know he has a conviction for crack cocaine in

5 July of 2006, right?

6 A. No.

7 Q. Are you also aware he has a conviction for-- or he was

8 charged with possession of cocaine and methamphetamine, ecstasy

9 in 2007 in Kalamazoo, aware of that?

10 A. No.

11 Q. All right. Was there a vehicle outside of the home during

12 the search of the home?

13 A. Yes.

14 Q. Tell us what kind of vehicle that was?

15 A. I believe it was a Chevy Traverse, an SUV.

16 Q. And was that vehicle searched, if you remember?

17 A. I don't remember.

18 Q. You don't remember the search, you don't remember anything

19 found in the vehicle, correct?

20 A. I don't remember that there was anything found in the

21 vehicle.

22 Q. Do you remember about the registration or the owner of

23 that vehicle?

24 A. No.

25 Q. You didn't later find that was a vehicle that Mr. Wilson

1  had driven?

2  A.  I don't recall.

3  Q.  So Mr. Rodney Martin, was he in the same room that you

4  recovered the firearms from?

5  A.  It's my understanding he was in the same room as the

6  firearms were recovered from.  I obviously didn't recover any

7  firearms personally.

8  Q.  Of course.

9        The firearms were recovered from-- all the firearms

10  were recovered in the same room that Mr. Rodney Martin was

11  prone out in, right?

12  A.  Yes.

13  Q.  You mentioned Rubbermaid totes found somewhere in the

14  home, right?

15  A.  At least one tote, yes.

16  Q.  That was--  Was or was that not, if you remember, in

17  Mr. Wilson's room?

18  A.  I don't believe it was.

19  Q.  You mentioned baggies, for whatever purpose, baggies in

20  the home and lottery tickets, do you recall that testimony?

21  A.  Yes.

22  Q.  Was that stuff in Mr. Wilson's room?

23  A.  No.  I believe that, at least the baggies, were on the

24  dining room table.

25  Q.  You also mentioned--  Sorry, let me go back.

1      You are the one that signed the continuation of the

2  criminal complaint in this case, right?

3  A.  Yes.

4  Q.  And you state in your probable cause section, Paragraph 5,

5  that a reliable confidential informant provided information to

6  the police, right?

7  A.  Yes.

8  Q.  Okay.  But today you can't testify to what that

9  reliability is; is that right?

10  A.  I'm told that it's a reliable informant, and I'm allowed

11  to rely on that.

12  Q.  Was the person--  I'm sorry, sir?

13  A.  And I'm able to rely on that.

14  Q.  Yes.

15      Does that reliability mean that person was used in

16  prior controlled buys?

17  A.  It can, yes.

18  Q.  But you don't know?

19  A.  I don't know that they have done other buys, no.

20  Q.  Are you aware of any officer that saw or referenced

21  Mr. Wilson holding or near any firearms on July the-- I'm

22  sorry, January 5th?

23  A.  Not that was reported.

24  Q.  Okay.  Not that was reported.

25      If I may jump ahead.  You wrote this-- you signed

1  your complaint on February the 15th, right?

2  A.  Yes.

3  Q.  February 15th, 2017?

4  A.  That sounds correct, yes, counselor.

5  Q.  And on that day, did you deliver Mr. Wilson's personal

6  property to a residence in Kalamazoo?

7  A.  Not that day, no.

8  Q.  What day was that?

9  A.  It was few days later.  We attempted to, there was no one

10  home.

11  Q.  Okay.

12  A.  A few days later.

13  Q.  And you delivered Mr. Wilson's personal property--  Well,

14  let me go back.

15        You received personal property from Kalamazoo County

16  Jail, Mr. Wilson's, right?

17  A.  Yes.

18  Q.  And you dropped that off at a residence for Mr. Wilson,

19  right?

20  A.  He asked me to give it to who he described as his

21  girlfriend.  He didn't say to take it to his residence.

22  Q.  Okay.  And where was that residence?

23  A.  I believe it was Banbury.  It was in Kalamazoo, not Hawley

24  Street.

25  Q.  Okay.  Thank you.

1    You said that there was, on direct, you said there

2  was a controlled buy from an informant on the day before the

3  search warrant?

4  A.  On or about.

5  Q.  And was the money-- marked money, police money, from that

6  buy discovered in the home during the search?

7  A.  It was on Rodney Martin's person.

8  Q.  The marked money was in Rodney Martin's pocket, right?

9  A.  Yes.

10  Q.  When you say person, I want to make sure, it was in his

11  pocket.

12    And how much money did Rodney Martin have on his

13  person?

14  A.  It was over $900.

15  Q.  Was there any marked money found on or near Mr. Wilson?

16  A.  Not-- No.

17  Q.  And did Mr. Wilson have any money or alleged to have any

18  money in his surroundings?

19  A.  Not that I'm aware of.

20  Q.  Thank you.

21    MR. UPSHAW:  No questions.

22    THE COURT:  Thank you, Mr. Upshaw.

23    Miss Sanford, redirect.

24    MS. SANFORD:  Thank you.

25

1      REDIRECT EXAMINATION

2  BY MS. SANFORD:

3  Q.  The majority of the evidence seized in this case was

4  seized from the livingroom and dining room area?

5  A.  Yes.

6  Q.  Which is essentially one large room, I think, as you've

7  described it or a living area with a dining table in it?

8  A.  Yes.

9  Q.  Okay.  So looking at Page 37 of the report, there is a

10  list of the evidence that was seized?

11  A.  Yes.

12  Q.  Items 1 and 2 are a spent and live shotgun shell, each

13  were found in the livingroom/dining room area; is that correct?

14  A.  Yes.

15  Q.  All right.  Was item Number 4 a digital scale which was

16  found in the kitchen?

17  A.  Yes.

18  Q.  Item 5 is two 380 rounds found in the kitchen?

19  A.  That is correct.

20  Q.  Item 7 was the Lotto tickets located in the livingroom?

21  A.  Yes.

22  Q.  That report describes it as a "huge amount of Lotto

23  tickets."

24  A.  That's correct.

25  Q.  There was the cocaine we discussed on the dining room

1 table?

2 A.  Yes.

3 Q.  Items 9 and 10 are two different boxes of ammunition that

4 were found in the livingroom on an end table?

5 A.  Yes.

6 Q.  I don't want to belabor this too much.

7      There was a mixed bag of ammunition on the dining

8 room table, that's Item 13?

9 A.  Yes.

10 Q.  Two digital scales with residue on the dining room table?

11 A.  Yes.

12 Q.  The sandwich bags on the dining room table?

13 A.  That is correct.

14 Q.  Item 16 are cocaine residue and razor blades found on a

15 plate on the dining room table?

16 A.  That's correct.

17 Q.  All right.

18      Was there anything found in the livingroom or dining

19 room that could be specifically attributed to Mr. Wilson?

20 A.  I don't believe so, no.

21 Q.  Was there a point at which he asked for his glasses?

22 A.  Yes.

23 Q.  Can you tell the Judge about Mr. Wilson asking for his

24 glasses?

25 A.  During the search warrant, Mr. Wilson asked for his

1   glasses.  The officer asked him to direct him to where they

2   were, and Mr. Wilson directed him to the dining room table.

3   Q.  They were prescription eyeglasses?

4   A.  I believe so, yes.

5   Q.  All right.  I have no further questions.  Thank you.

6        THE COURT:  Mr. Upshaw, brief recross?

7        MR. UPSHAW:  No, your Honor.

8        THE COURT:  Any further questions?

9        MS. SANFORD:  No, your Honor.  Thank you.

10       THE COURT:  You may step down.

11       THE WITNESS:  Thank you, Judge.

12       (At 3:05 p.m., the witness was excused.)

13       MS. SANFORD:  Your Honor, for purposes of this

14  probable cause hearing, the government has no further proofs

15  and we rest.

16       THE COURT:  Mr. Upshaw, any evidence on the issue of

17  probable cause?

18       MR. UPSHAW:  No, your Honor.

19       THE COURT:  Okay.  Argument.

20       MS. SANFORD:  Your Honor, I would argue that based on

21  the evidence the Court has heard, there is probable cause to

22  believe that this defendant, who is a convicted felon, who does

23  not have the right to possess firearms, was in possession of

24  the weapons that we have discussed.  At least some of the

25  weapons were out in the open, three of them, two shotguns and a

1 handgun were out in the open and the common areas of this

2 house, which means he at least had the right to possess

3 constructively those guns, to move them, use them, etcetera.

4 Additionally, I would argue that based on the

5 information that the Court has regarding the controlled buy,

6 the statement of Mr. Hundley, and the evidence seized, there is

7 sufficient evidence for a probable cause hearing to believe

8 that this defendant was in possession of cocaine with the

9 intent to distribute it either on his own or jointly with

10 Mr. Martin, his charged co-defendant. We have testimony that a

11 controlled-- or a confidential informant did controlled buys

12 out of their residence from each of those people. We have the

13 statement of Mr. Hundley that he had obtained cocaine from each

14 of those people. I think it's sufficient for purposes of

15 probable cause.

16 Regarding detention, would the Court like me to

17 address that at this time or?

18 THE COURT: No, we will hold that. And I'll hear

19 from Mr. Upshaw.

20 MS. SANFORD: Thank you.

21 Just on the issue of probable cause.

22 MR. UPSHAW: Yes, your Honor.

23 I think we said the amount on the record of powder

24 cocaine found in the home, I think so. But five grams of

25 powder cocaine was found in the home, and Mr. Wilson is-- this

1   is a probable cause hearing, so we understand that, but is

2   there probable cause to believe that the five grams of crack

3   cocaine in the home my client possessed, and he possessed that

4   with the intent to distribute that five grams of crack cocaine

5   in the home-- I'm sorry, powder cocaine-- powder cocaine in the

6   home, so we look at the facts.  We know there was five grams of

7   powder cocaine in the home that was immediately adjacent to or

8   near Rodney Martin, who was prone out in the livingroom area,

9   feet-- however many feet next to the Pringles can with the

10  powder cocaine.  In his pocket, Mr. Martin has controlled buy

11  money that he used obviously came from a sale to an informant

12  the day or two before.

13       We have information that Mr. Wilson had sold crack

14  cocaine to someone in the past.  But he is not charged with

15  selling the crack cocaine in the past, that's not a basis for

16  what we are here for today is that he possessed that powder

17  cocaine in the house, and that he intended to sell that powder

18  cocaine.  I don't think there is any sufficient evidence.

19  Let's look at other evidence.  Upstairs in the crack head's

20  bedroom, I'm sorry, Mr. Hundley's bedroom.  Mr. Hundley, as we

21  know in this case, is a known crack addict as described by

22  officers.  He was in the room.  He was in the room with the

23  crack pipe in his room that may or may not have had residue on

24  the pipe.

25       He also had a gun holster in his room in a house that

1 had weapons and ammunition. So just as it relates to the

2 powder cocaine, the room that they would attribute to

3 Mr. Wilson, there is no evidence in that room that there is any

4 evidence on this record of drug use or drug possession or

5 powder cocaine or crack cocaine, there is nothing in that

6 room. All of the evidence at the probable cause hearing seems

7 to suggest that the powder cocaine was near the wing span of

8 Mr. Martin as he was prone in the livingroom. Okay.

9      The gun charge, I just simply would say that Rodney

10 Martin was present in the dining room/livingroom, there were

11 multiple guns, there were-- it was ammunition, there were shell

12 casings adjacent to Mr. Rodney Martin. There is no suggestion

13 or evidence that Mr. Wilson was near weapons, had ever

14 possessed weapons, had a right to control the weapons.

15 Information in this case is that he was upstairs at the time of

16 the breach by law enforcement, came down stairs at the command

17 of law enforcement, was cuffed, arrested, questioned.

18      So we certainly understand the burden here is quite

19 low, but I don't believe that probable cause has been

20 established on either count, given the testimony we've heard.

21      THE COURT: All right. Thank you, Mr. Upshaw.

22      Any rebuttal argument?

23      MS. SANFORD: No, thank you, your Honor.

24      THE COURT: Well, the burden is low. Finding

25 probable cause requires only finding of a fair probability

1  based on a totality of the circumstances to believe that a

2  crime has been committed and that the defendant committed it.

3      And I will say in this case, it's a closer call than

4  maybe I'm used to, but the fact remains that Mr. Wilson was

5  found in the house, 732 Hawley, at the time the search warrant

6  was executed.  The government has the statement of a

7  confidential informant that on December 22, 2016, he had

8  purchased cocaine from Mr. Wilson at the residence.

9      At the time that law enforcement executes the search,

10  cocaine is found in the residence.  Now, Mr. Upshaw would say

11  yes, but it's powder, and the cocaine that the C.I. allegedly

12  bought from Mr. Wilson was crack.  But it's-- the fact of the

13  matter is there was cocaine in the residence.  There was also

14  paraphernalia suggestive of drug dealing, including the lottery

15  tickets, which are commonly used to package and sell small

16  quantities of cocaine, scales, and other paraphernalia.

17      And although Mr. Wilson was upstairs when the police

18  arrived at the residence, I-- certainly we can't-- it can't be

19  that circumstance upon which my decision hinges, because I

20  doubt that if Mr. Wilson happened to have been downstairs in

21  the living/dining room area drinking a, you know, a beer, that

22  Mr. Upshaw would now be conceding probable cause because my

23  client was in the general vicinity of the drugs.  So it can't

24  simply be the happenstance that Mr. Wilson was upstairs when

25  law enforcement arrived to execute the search.  So there is

1  drugs, drug paraphernalia suggestive of drug dealing, there's

2  the C.I. testifying that he had actually bought drugs from

3  Mr. Wilson there.

4      I find that the government's burden of establishing a

5  fair probability that Mr. Wilson was engaged in drug dealing

6  has been met.  Although I will concede the weaknesses in the

7  government's case that Mr. Upshaw has skillfully attempted to

8  exploit here this afternoon.

9      Turning then to the issue of the guns.  Again, I-- I

10 mean the government has offered no-- has no witness who will

11 say they saw any of the four firearms in Mr. Wilson's hands at

12 any time, much less, you know, close to the time the search was

13 executed.  Apparently no fingerprint evidence that would link

14 Mr. Wilson's fingerprints to any of the guns, no DNA evidence,

15 and I understand it's early, that evidence might be coming, I

16 don't know, but as I sit here today, there is also no DNA

17 evidence.

18     On the other hand, guns are commonly possessed and

19 used by people engaged in drug dealing to protect themselves,

20 to protect the drugs that they are selling.  These guns were

21 all out in-- or most of them were in a common area which would

22 have been not only readily accessible to Mr. Wilson, but which

23 there is at least circumstantial evidence that Mr. Wilson used,

24 I mean his glasses were found on the dining room table--

25 following his request for his glasses were found on the dining

1  room table in close proximity to both the cocaine and the guns

2  that were nearby.  And so, although the government has no

3  direct evidence, which I think could be problematic, if the

4  case ends up going to trial.

5       Again, the burden of proof here on the government is

6  low.  It's my finding that because the guns were found in

7  common areas, which Mr. Wilson clearly had the right to occupy,

8  and which he clearly had been occupying during his time at this

9  address, and the fact that I have already found probable cause

10  to believe that he was a drug dealing-- involved in drug

11  dealing at that residence, that the government has met its

12  burden of proving a fair probability based upon the totality of

13  the circumstances that he possessed those firearms at least

14  constructively.

15       There is no-- Mr. Upshaw did not contest the

16  interstate nexus, and he couldn't really in any meaningful way,

17  or contest that Mr. Wilson has a whole bunch of prior felony

18  convictions, so those two elements seem clear to me.  The

19  question of possession far less clear.  But as I say, clear

20  enough for the purposes of probable cause in this proceeding.

21       So it's my finding that there is probable cause.  I

22  bind Mr. Wilson over to the grand jury on both charges.

23       Turning then to the issue of bond.  Miss Sanford.

24       MS. SANFORD:  Thank you.

25       THE COURT:  Do you wish to be heard on that issue?

1     MS. SANFORD:  Yes, please, your Honor.

2     I know the Court has a copy of the report that was

3  written by pretrial services regarding this matter, so I'm

4  going to try not to belabor this.

5     THE COURT:  I do have that.  I've read it.  I adopt

6  it, and make it part of the record in this proceeding.

7     MS. SANFORD:  It is the position of the government

8  that the defendant poses a risk of danger because of the nature

9  of this offense, the fact that he was in this house with five

10  grams of cocaine and numerous packaging supplies, scales,

11  baggies, etcetera, and with four guns, some of which were

12  loaded, some of which had been reported stolen.

13     Additionally, his history of similar offenses and a

14  pretty terrible track record of complying with probation makes

15  the government skeptical that even if this Court attempted to

16  put into place some protections, and condition to keep the

17  public safe and to keep the defendant away from criminal

18  activity, I am skeptical he could or would comply with those.

19     In 2002, he was convicted of possession with intent

20  to distribute narcotics.  He had two probation violations in

21  2003 and in 2004.  In 2006, he had another possession with

22  intent to distribute controlled substance.  That had a

23  probation violation.  In fact, in 2006, he had two possession

24  with intent to distribute controlled substance convictions,

25  which resulted in probation violations in 2010.

1     In 2012, another possession with intent to distribute

2  conviction, which resulted in a probation violation in 2013.

3  And then in 2015, there has been a warrant that is still active

4  for his arrest for possession with intent to deliver.

5     I think he does pose a risk of danger.  I also think

6  there is a very serious risk of nonappearance.  Also given his

7  record in 2003 he failed to appear on a driving while suspended

8  license case in Kalamazoo.  In 2004, he had a driving with a

9  suspended license case again in Kalamazoo for which he failed

10  to appear three times.  In 2013 and 2014, he had two other

11  driving offenses for which he did not appear in court.  Again,

12  he still has this unresolved felony warrant from 2015.  So I

13  think based, both on his risk of danger and risk of

14  nonappearance, he should be remanded pending trial.

15     Thank you.

16     THE COURT:  Thank you, Miss Sanford.

17     Mr. Upshaw, by my calculation, your client has

18  actually five prior convictions for manufacture or delivery of

19  less than 50 grams with one pending case out of Chelsea,

20  Michigan, six probation violation or revocations, and six

21  failures to appear.  So I'll need to hear from you on those.

22     MR. UPSHAW:  Thank you, your Honor.

23     With that introduction, now we will not advance an

24  argument, Judge.  Mr. Wilson does have an active warrant out of

25  Monroe County that we are aware of, so we will just rely on the

1 pretrial services report. We won't concede he should be

2 detained, we just ask the Court to rely on the report and make

3 your decision.

4 　　　THE COURT: All right. Thank you, Mr. Upshaw.

5 　　　The consideration of bond must begin with the 8th

6 Amendment to the United States Constitution, which prohibits

7 excessive bail. The 8th Amendment requirements are codified in

8 the Bail Reform Form Act, 18 U.S.C. 3142, Subsection B, of

9 which requires the Court to order the pretrial release of the

10 defendant on personal recognizance unless the Court determines

11 such release will not assure appearance of defendant or will

12 endanger the community.

13 　　　Subsection C further refines the Court's obligation

14 requiring that even where a personal recognizance will not

15 assure appearance and safety of the community, the Court should

16 nonetheless, release a defendant subject to the least

17 restrictive conditions or combination of conditions that will

18 reasonably assure appearance and safety of the community.

19 　　　This would be a presumption case, would it not, Miss

20 Sanford?

21 　　　MS. SANFORD: It would, your Honor.

22 　　　THE COURT: In 18 U.S.C. 3142(e), the charges against

23 Mr. Wilson give rise to a rebuttable presumption that he should

24 be detained in this case, where the controlled substance

25 offense carries a maximum penalty of ten years or more.

1      I've already discussed the burden of proof, which is

2  on the government on these issues.  3142(g) lays out the

3  factors I am to consider.  The first of which is the offense

4  itself, whether it involves violence or narcotic drug offense,

5  it does.  In this case it involves allegations of drug

6  dealing.  The weight of the evidence against the defendant.

7  This factor is accorded the least weight because of the

8  presumption of innocence.  Here the way--  I mean the

9  evidence-- the testimony of the C.I. is directive of drug

10  dealing, so the evidence with regard to that element is

11  strong.  Mr. Upshaw points out what he perceives as flaws in

12  the government's analysis of what is after that largely

13  circumstantial evidence.  But there is still obviously enough

14  evidence that in my mind it supports probable cause.  So I

15  would characterize in this case that factor as neutral.

16      Looking then at the history and characteristics of

17  the defendant.  Born in Detroit.  Lived there for quite

18  sometime.  Moved to Kalamazoo in 2000.  Been kind of back and

19  forth between Kalamazoo and Detroit.  Never been married.  Has

20  no children that I know of.  Not employed.  Some student loans,

21  so obviously he made an attempt at college.  Have some physical

22  problems, but it doesn't appear to me-- I don't know what they

23  are, the facts from the pretrial services report sound like

24  something that should be followed up on, but nothing really

25  that would bear upon my decision on bond.

1       History relating to drug or alcohol abuse.  Really no

2  self-reported history, and I have no reason to believe that

3  there is other history other than his many convictions for drug

4  dealing.  I don't have any evidence in front of me suggesting

5  that he has a drug problem.

6       That brings us then to criminal history.  Mr. Wilson

7  has an extensive criminal history including, as I say, by my

8  count at least five convictions for delivery or manufacture

9  less than 50 grams.  I'm guessing that most or all of these

10  involve either cocaine or crack cocaine.  He has a dangerous

11  drug charge out of Kalamazoo, it's unclear what happened to

12  that case.  Possession of marijuana conviction.

13       Looking then at his record of appearing at court

14  proceedings, as I said earlier, I count six failures to appear

15  and six additional probation violation or revocation

16  proceedings, which suggests to me that Mr. Wilson is not

17  amenable to court supervision because he has repeatedly

18  violated the terms of such supervision in the past.

19       On the question of danger to the community, it's my

20  finding that the government has met its burden of proving by

21  clear and convincing evidence that Mr. Wilson is a danger to

22  the community.  This is based on his five prior convictions for

23  drug dealing, his pending drug dealing in charge, the fact that

24  there is evidence in this case that he is involved in drug

25  dealing, and there are guns at least in the premises where he

1    was found.

2           As every person in this room knows, you know, the

3    combination of drugs and guns is a very toxic combination and

4    leads to all kinds of things including, you know, drug dealers

5    being shot, the families of drug dealers being shot, innocent

6    children playing in the yard next door being shot as some other

7    drug dealer comes by and tries to make a point, police officers

8    being shot, other people being shot.  It's my finding that the

9    government has met its burden on danger to the community, and

10   also by a preponderance of the evidence, it has met its burden

11   on risk of nonappearance based upon the six failures to appear

12   and the six probation violation or revocation proceedings.

13          Miss Sanford, anything else on Mr. Wilson's case?

14          MS. SANFORD:  Not today.  Thank you, your Honor.

15          THE COURT:  Let me just say, I'm ordering him

16   remanded to the custody of the marshals pending further

17   proceedings before the grand jury.  Do we know--

18          MS. SANFORD:  That will be Thursday afternoon, your

19   Honor.

20          THE COURT:  Okay.  And Mr. Wilson, understand if the

21   grand jury reviews the evidence in this case and reaches a

22   different conclusion than I have, the charges against you will

23   be dismissed and you'll be released.

24          Mr. Upshaw, anything further from you on this

25   matter?

1          MR. UPSHAW:  No, your Honor.  Thank you.

2          THE COURT:  All right.  Mr. Wilson, did you

3   understand everything that happened in court here this

4   afternoon?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you have any questions for me before I

7   adjourn your case?

8          THE DEFENDANT:  No.

9          THE COURT:  Well, good luck to you, sir.

10          COURT CLERK:  All rise.  Court is adjourned.

11          (At 3:27 p.m., proceedings were concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                         CERTIFICATE

6

7

8       I certify that the foregoing is a transcript from the

9    Liberty Court Recording System digital recording of the

10   proceedings in the above-entitled matter, transcribed to the

11   best of my ability.

12

13

14

15

16

17                    Kathleen Sue Thomas/s/

18                    Kathleen Sue Thomas, CSR-1300

19

20

21

22

23

24

25